UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

| | |
|---|---|
| KING PHARMACEUTICALS, INC., *et al.* ) | |
| ) | |
| v.   ) | NO. 2:09-CV-244 |
| ) | |
| ZYMOGENETICS, INC., *et al.* ) | |

### MEMORANDUM OPINION AND ORDER

This matter is before the Court on motions of the plaintiffs seeking preliminary injunctions. The plaintiffs seek three separate preliminary injunctions: (1) preliminary injunction regarding Defendant ZymoGenetics, Inc.'s use of "Thrombin-JMI" or a variant thereof as a Google Adword ("Adword") [Doc. 2]; (2) preliminary injunction regarding Defendant ZymoGenetics, Inc.'s lawsuit prevarications [Doc. 6]; and (3) preliminary injunction regarding Defendant ZymoGenetics, Inc.'s comparative promotional safety claims ("CPSC") [Doc. 4]. Defendants have responded in opposition, and this Court held a hearing on November 16, 2009. For the reasons which follow, plaintiffs' motions will be DENIED.

**I.     Background**

King Pharmaceuticals, Inc. and its predecessors and subsidiaries (collectively "King" or plaintiffs) have manufactured, marketed, and sold topical

thrombin products for over forty years.  Thrombin is a coagulation protein in the blood stream that aids in the human body's ability to form a blood clot thereby helping to reduce the amount of blood loss through minor oozing or bleeding. Since 1995, King's topical thrombin has been sold under the trademark Thrombin-JMI®. King R&D owns the trademark, U.S. Reg. No. 2,044,605, for use in connection with "clotting preparation" (the "605 Registration").  Thrombin-JMI® is a biologically active hemostatic agent that works directly at the end of the blood coagulation cascade to help form a clot through conversion of fibrinogen to fibrin.  This product, according to King, has been used in over thirteen million procedures, and it is currently the only approved stand-alone bovine thrombin formulation marketed in the United States.

King R&D permits King to use the trademark through a written license agreement.  King has advertised the product extensively and directly to health care providers throughout the United States under this trademark.  King has a website, <www.thrombin-jmi.com>, which is directed toward those involved in the selection of topical thrombins for use in surgical procedures.  King sells the product primarily through wholesalers to institutions.  None of the product is sold through the website.

ZymoGenetics, Inc. ("ZymoGenetics" or defendant) manufactures, markets, and sells only one product, a topical rhThrombin product sold under the trademark RECOTHROM®.  This product is a recombinant drug created through

recombinant DNA technology that uses a Chinese hamster ovary cell line to produce pre-thrombin that is activated by snake venom to convert the pre-thrombin into thrombin. Its Prescribing Information states that the product is created to have the identical amino acid sequence and similar structure to human thrombin. It is not, however, completely identical to human thrombin. RECOTHROM® is the only rhThrombin product in the hemostatic modifier market. ZymoGenetics uses similar marketing channels as King, and ZymoGenetics primarily sells RECOTHROM® through wholesalers to institutions and healthcare providers. It also has a website, <www.recothrom.com>, from which a purchaser cannot directly buy the product. In addition, ZymoGenetics sponsors the website <www.postopbleeding.org>.

The United States Food and Drug Administration ("FDA") granted ZymoGenetics' Biologics Licensing Application ("BLA") on January 17, 2008. In the approval letter, the FDA stated that ZymoGenetics "should not make a comparative promotional claim or claim of superiority over other products unless [it has] submitted data to support such claims to [the FDA] and received [Center for Biologics Evaluation and Research] approval for such claims." On April 25, 2008, the FDA issued another letter that stated that a statement contained in a January 17, 2008 Press Release, located in the "Newsroom" portion of defendant's website, at <www.zymogenetics.com>, was "false or misleading because it suggests that

Recothrom is safer than the bovine thrombin product due to a lower incidence of antibody formation in the patients who took the Recomthrom. However, this statement excludes important contextual information necessary to understand the limitation of this finding. . . . [T]he development of antibodies in either group did not lead to any adverse events such as excessive bleeding."

Since 1995, King has sold in excess of one billion dollars of the Thrombin-JMI®. line of products. According to King, its share of the hemostatic modifier market in February 2008 was 41.3 percent. In December, 2008, its share was 39.4 percent, and by August 2009 had declined to 35.3 percent. King's sales have continued to decline since August, 2009. In addition, King has been requested to provide additional safety materials to numerous customers. King asserts that it has lost customers due to ZymoGenetics' marketing practices and in particular, due to three specific actions of ZymoGenetics: (1) the purchase of "Thrombin-JMI" and other variants as a Google Adword; (2) lawsuit prevarications; and (3) CPSC.

First, ZymoGenetics purchased the term "Thrombin-JMI" as a Google Adword on March 18, 2009. As a result, a "Sponsored Link" to the RECOTHROM® website along with a link to the RECOTHROM® website appeared on the results page of any Google search using the Adword. The defendant claims that any sponsored link would have been set off above or beside the actual search results in a different

4

color and background. Additionally, the word "sponsored" would have appeared above the link. According to the defendant, it cancelled its use of the Adword "after it learned of the instant lawsuit," and it agrees not to use the Adword in the future. Furthermore, the defendant claims that it only received 84 "clicks" as a result of the Adword purchase; whereas, the use of the generic Adword "Thrombin" has resulted in 48,802 impressions and 803 "clicks."

Second, King claims that defendant, through its sales representatives, has told Thrombin-JMI® customers about its lawsuit prevarications. King asserts that no lawsuits based on an alleged harm caused by exposure to Thrombin-JMI® are pending or have ever been filed. Moreover, King is not aware of one of its customers being sued as a direct result of using its product. ZymoGenetics claims that its representatives have not done this and that "upon being informed of the allegations, ZymoGenetics has taken affirmative steps to make sure that these statements are not made in the future."

Third, King claims that ZymoGenetics has made misleading CPSC in different contexts. The first is on ZymoGenetics' websites, <www.zymogenetics.com> and <www.postopbleeding.org>. The second context is sales representatives' statements, and the third is advertisements and promotional materials. Some of these statements include: (1) "[B]ovine-derived thrombin has been

5

associated with the development of antibodies that may crossreact with human blood proteins and in some cases, these antibodies appear to be related to serious bleeding complications."; (2) "The Phase 3 pivotal study [sponsored by ZymoGenetics] showed the rhThrombin had comparable efficacy and superior immunogenicity compared to the marketed bovine thrombin product"; (3) "Thrombin-JMI contains bovine Factor V, which is foreign to humans.  The immune systems may respond by producing antibodies, which can cross-react with human Factor V and potentially result in Factor V deficiency and severe bleeding." (4) "There have been reports of coagulation problems, severe bleeding and, in rare cases, death in some patients who develop antibodies to bovine thrombin preparations"; and (5) "The risks associated with cattle thrombin may stay with patients long after surgery."

ZymoGenetics argues that these statements are based on scientific literature and King's own "black box warning," which is a warning required by the FDA.  The warning reads:

> The use of topical bovine thrombin preparations has occasionally been associated with abnormalities in hemostasis ranging from asymptomatic alterations in laboratory determinations, such as prothrombin time (PT) and partial thromboplastin time (PTT), to severe bleeding or thrombosis which rarely have been fatal.  These hemostatic effects appear to be related to the formation of antibodies against bovine thrombin and/or factor V which in some cases may cross react with human factor V, potentially resulting in factor V deficiency.  Repeated

6

> clinical applications of topical bovine thrombin increase the likelihood that antibodies against thrombin and/or factor V may be formed. Consultation with an expert in coagulation disorders is recommended if a patient exhibits abnormal coagulation laboratory values, abnormal bleeding, or abnormal thrombosis following the use of topical thrombin. Any interventions should consider the immunologic basis of this condition. Patients with antibodies to bovine thrombin preparations should not be re-exposed to these products.

At the hearing on this matter, counsel for ZymoGenetics admitted, only after repeated questioning from this Court, that nothing in the scientific literature, on which it relies, legally establishes that bovine thrombin directly causes death.

## II.     Analysis and Discussion

### A.    Factors to be considered in determining whether a preliminary injunction should be granted

The Court must consider four factors in determining whether to grant a preliminary injunction:

> (1) whether the plaintiffs have a strong likelihood of success on the merits;
>
> (2) whether, without the injunction, the plaintiffs will suffer irreparable harm;
>
> (3) whether issuance of the injunction will cause substantial harm to the defendant or others; and
>
> (4) whether the public interest would be served by the issuance of a preliminary injunction.

7

*United Food and Commercial Workers Union v. Southwest Ohio Regional Transit Authority*, 163 F.3d 341, 347 (6th Cir. 1998). These factors are not prerequisites to the issuance of an injunction but are factors to be balanced in considering whether to grant the injunction. *Id*.

Regarding the second factor, the plaintiffs claim they will suffer harm in the form of lost profits, permanent loss of business and customer referrals and injury to goodwill for which they cannot be compensated through monetary damages unless a preliminary injunction issues in this case. Harm that is compensable through monetary damages generally will not justify a preliminary injunction. *Basicomputer Corp. v. Scott*, 973 F.2d 507, 512 (6th Cir. 1992). Also, the Sixth Circuit has not held that irreparable injury can be presumed in the context of a false advertising claim. In addition, undue delay in seeking relief suggests that there is no irreparable harm. *GTE Corp. v. Williams*, 731 F.2d 676, 678 (10th Cir. 1984).

**B. Google Adword**

Regarding the Adword, ZymoGenetics stated that it had ceased using King's trademark and that it would not do so in the future. Thus, King cannot establish irreparable injury without the injunction, the second factor in the analysis. This weighs heavily in ZymoGenetics' favor. Again, after the filing of the lawsuit, ZymoGenetics ceased the action for which King sought a preliminary injunction.

8

Weighing all of the factors, this Court concludes that a preliminary injunction is not warranted. Therefore, King's motion in this regard is **DENIED**.

### C. Lawsuit Prevarications

Regarding the lawsuit prevarications, ZymoGenetics claims that none were made or will be made. It states that it has taken affirmative steps with its sales representatives to make sure none will be made. This Court cannot find that King is likely to succeed on the merits, for this issue is hotly contested. King supports its claims with declarations and testimony, and ZymoGenetics filed countervailing declarations disputing King's allegations. In addition, because ZymoGenetics assures it has taken affirmative steps to prevent such statements in the future, King cannot establish irreparable harm. Accordingly, weighing all of the factors, this Court concludes that a preliminary injunction is not warranted. King's motion is **DENIED**.

### D. Comparative Promotional Superiority and Safety Claims

This issue is hotly contested. Both parties filed many declarations and documents and presented testimony at the November 16, 2009 hearing. From this vast volume of evidence on both sides, which this Court has read and considered, this Court cannot find that King is likely to succeed on the merits. The issue is very scientific and technical, and there is a wealth of evidence on both sides. This factor weighs against King.

Regarding the second factor, irreparable harm, King claims that it has and will continue to suffer harm in the form of lost profits, permanent loss of business and customer referrals and injury to goodwill for which it cannot be compensated through monetary damages unless a preliminary injunction issues in this case. Harm that is compensable through monetary damages generally will not justify a preliminary injunction. *Basicomputer Corp. v. Scott*, 973 F.2d 507, 512 (6th Cir. 1992). King has asserted its lost profits and lost percentage of the market share; however, it cannot establish that its losses could not be compensable through monetary damages. In addition, apparently RECOTHROM® is the first topical thrombin product to be introduced into the market to provide competition for Thrombin-JMI®. Thus, King's lost profits and market share could be a result of actually having some form of competition, not unfair competition.

In addition, as noted above, undue delay in seeking relief suggests that there is no irreparable harm. *GTE Corp. v. Williams*, 731 F.2d 676, 678 (10th Cir. 1984). ZymoGenetics received FDA approval for RECOTHROM® on January 17, 2008. According to King, its share of the hemostatic modifier market in February 2008 was 41.3 percent. In December its share was 39.4 percent, and by August 2009 had declined to 35.3 percent. Thus, King's profits started to decline well over one year ago. Furtermore, there is evidence in the record that King complained of

ZymoGenetics' advertising even before the FDA approval on January 17, 2008, yet King waited until November 2, 2009, to file this action. King claims that it needed time to investigate the claim and that ZymoGenetics "significantly increased its attacks." Nonetheless, the delay does not reflect positively upon King's claim for irreparable harm. The second factor also weighs in ZymoGenetics' favor.

As to the third factor, substantial harm to others, ZymoGenetics' only product is RECOTHROM®, and it was created, according to ZymoGenetics, because, as a recombinant human thrombin product, it does not contain the same antibody formation and immune-mediated coagulopathy concerns as bovine thrombin. Thus, the issuance of this particular preliminary injunction could cause substantial harm to this one-product company which relies upon the above-stated difference in its product as compared to the competition. As such, this factor weighs in ZymoGenetics' favor.

Finally, this Court must balance as a factor whether the public interest would be served by the issuance of the injunction. This Court cannot find that this factor weighs in either party's favor. In essence, depending upon whose science is correct, this factor could go either way. The general public really is not the focus because the product is directly and extensively marketed to healthcare professionals who are highly sophisticated. These professionals can evaluate the scientific data and make an informed decision on which product is best for their patients.

After balancing all factors, this Court concludes that a preliminary injunction is not warranted. Therefore, King's motion is denied.

## III. Conclusion

This Court has balanced all necessary factors when considering whether to grant any of the three motions for preliminary injunctions. For the reasons set forth above, this Court has concluded that none of the preliminary injunctions are warranted. Therefore, all of King's motions, [Docs. 2, 4, and 6], are **DENIED**.

SO ORDERED.

ENTER:

s/J. RONNIE GREER<br>UNITED STATES DISTRICT JUDGE